# IN THE SUPREME COURT OF TEXAS

No. 18-0350

FRANK LUCIANO AND HELENE LUCIANO, PETITIONERS,

v.

SPRAYFOAMPOLYMERS.COM, LLC, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued January 8, 2020**

JUSTICE DEVINE delivered the opinion of the Court.

SprayFoamPolymers.com, LLC is an out-of-state entity that manufactures and sells insulation products to residential and commercial customers. Frank and Helene Luciano, a Texas couple, built a home in Texas, purchased spray foam insulation services from a Texas-based installation company, suffered injuries in Texas allegedly arising from the insulation, and now seek to hold parties in the chain of distribution liable for these alleged injuries. The issue presented is whether Texas courts may exercise personal jurisdiction over SprayFoam.

The Lucianos sued SprayFoam—the manufacturer of the insulation—and Old World Cast Stone—the installation company—in Travis County. SprayFoam filed a special appearance

contesting personal jurisdiction. The trial court denied SprayFoam's special appearance without issuing findings of fact or conclusions of law. The court of appeals reversed, holding that the Lucianos failed to establish either general or specific personal jurisdiction over SprayFoam. 584 S.W.3d 44, 50–53 (Tex. App.—Austin 2018). The Lucianos petitioned this Court for review.

We reverse and hold that when a manufacturer like SprayFoam "serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1022 (2021).

## I. Background

SprayFoam is a Connecticut corporation with its principal place of business and sole office in Connecticut. Since 2006, SprayFoam has been in the business of manufacturing and selling spray foam insulation to residential and commercial customers. The insulation is a polyurethane foam designed to make homes "more energy efficient, quieter, healthier and more comfortable" by sealing the cracks, crevices, and voids where air loss and infiltration occur. SprayFoam receives and approves all orders at its Connecticut office. Once payment is received, SprayFoam distributes its product to the customer.

In July 2013, the Lucianos hired Old World to install spray foam insulation into the wall cavities and roof deck of their new home in Leander, Texas. The Lucianos maintain that they were never informed of any health risks associated with the insulation. After moving into their new home in December, the Lucianos noticed a strong odor. They allege that they soon began suffering from coughing spells, itchy and burning eyes, allergies, and headaches. For months the Lucianos

were told by both Old World and SprayFoam that the odor would lessen over time, but the problem persisted.

In September 2014, at SprayFoam's behest, the Lucianos acquired the project specifications sheet from Old World which showed that "Thermoseal 500," a product manufactured by SprayFoam, had been installed in their home. SprayFoam then sent Preston Nix, whom SprayFoam describes as its "independent contractor sales representative," to inspect the Luciano home. The Lucianos never received the results of Nix's inspection.

The Lucianos thereafter sued Old World and SprayFoam in Travis County, Texas, pleading claims of negligence, products liability, breach of warranties, nuisance, breach of contract, and violations of the Texas Deceptive Trade Practices Act. The Lucianos allege their claims arise from the sale and installation of SprayFoam's Thermoseal 500 in their home, and the failure to remediate the harm caused by the insulation.

In response, SprayFoam specially appeared to contest the trial court's ability to exercise personal jurisdiction over it. SprayFoam supported its special appearance with the affidavit of its general manager, Richard Ettinger. Ettinger's affidavit provided a laundry list of geographical facts, including assertions that SprayFoam had never sold or advertised any of its products in Texas, had no control over or involvement with Nix or Nix's business, and had contracted with a "Colorado third-party logistics company" for "outsourced logistics services in Texas." The Lucianos replied with an affidavit from their attorney Dawn M. Smith. Smith's affidavit attached screenshots from multiple websites, including (1) Nix's LinkedIn page on which he held himself out to be SprayFoam's "Southwest Sales Manager"; (2) Old World's webpage reflecting that it sold Thermoseal 500; and (3) screenshots from SprayFoam's own webpage, retrieved from an

3

archival source called WaybackMachine, where SprayFoam claimed it used a "Grand Prairie TX Distribution Center." SprayFoam raised authentication and hearsay objections to the evidence.

The trial court overruled SprayFoam's authentication and hearsay objections to these three pieces of evidence and denied SprayFoam's special appearance, signing an order without any findings of fact or conclusions of law. The court of appeals reversed the trial court's denial of SprayFoam's special appearance. 584 S.W.3d at 47. After assuming the trial court properly admitted some of the Lucianos' proffered evidence, *id.* at 50, the court of appeals concluded that the Lucianos had not shown that SprayFoam established sufficient minimum contacts with Texas to justify exercising either general or specific personal jurisdiction over SprayFoam, *id.* at 51–53. The court thus dismissed SprayFoam from the Lucianos' suit for lack of jurisdiction. *Id.* at 53. We granted the Lucianos' petition for review. [1]

## II. Special Appearance

### A. Applicable Law

A court must have both subject matter jurisdiction over a case and personal jurisdiction over the parties to issue a binding judgment. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871 (Tex. 2010) (citing *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996)). Personal jurisdiction involves a court's ability to bind a particular party to that judgment. *CSR*, 925 S.W.2d at 594 (citation omitted). Whether a court may exercise power over a party is a question of law, which we review de novo. *Spir Star*, 310 S.W.3d at 871 (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)). Resolving this question of law, though, may require a court to decide

---

[1] After we granted the Lucianos' petition for review, *see* TEX. GOV'T CODE § 22.001(a), we abated the case to await the United States Supreme Court's decision in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021).

questions of fact. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). When, as here, the trial court does not issue findings of fact and conclusions of law with its judgment, we presume all factual disputes were resolved in favor of the trial court's decision unless they are challenged on appeal. *Id.*; *see Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam).

Texas courts may assert personal jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction and (2) the exercise of jurisdiction is consistent with federal due-process guarantees. *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016) (citing *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013)). The Texas long-arm statute broadly permits jurisdiction over a nonresident doing "business in this state" if the nonresident "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE § 17.042(2). Allegations that a tort was committed in Texas satisfy our long-arm statute, *Moncrief Oil*, 414 S.W.3d at 149, but such allegations must also satisfy due-process requirements, *Spir Star*, 310 S.W.3d at 872; *see* U.S. CONST. amend. XIV, § 1. Here, the Lucianos allege that SprayFoam committed a tort in Texas. Consequently, the requirements for personal jurisdiction are satisfied if exercising jurisdiction comports with federal due-process limitations.

Consistent with federal due-process protections, a state may assert personal jurisdiction over a nonresident defendant only if the defendant has established "minimum contacts" with the forum state such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Spir Star,* 310 S.W.3d at 872; *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007); *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 436 (Tex. 1982). The plaintiff bears the initial burden of

pleading allegations sufficient to confer jurisdiction. *Moki Mac*, 221 S.W.3d at 574 (citing *Coleman*, 83 S.W.3d at 807). The burden then shifts to the defendant to negate all bases of jurisdiction in the allegations. *Id.* (citing *BMC*, 83 S.W.3d at 793); *Moncrief Oil*, 414 S.W.3d at 149.

A defendant's contacts with the forum can give rise to either general or specific jurisdiction. *Spir Star*, 310 S.W.3d at 872. A court has general jurisdiction over a nonresident defendant whose "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *TV Azteca*, 490 S.W.3d at 37 (alteration in original) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). By contrast, specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co.*, 141 S. Ct. at 1024. The minimum contacts necessary for specific jurisdiction are established if the defendant purposefully avails itself of the privilege of conducting activities in the forum state, *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 877 (2011) (plurality opinion), and the suit "arise[s] out of or relate[s] to the defendant's contacts with the forum," *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017); *Moki Mac*, 221 S.W.3d at 576.

The court of appeals concluded that the Lucianos' suit conferred neither general nor specific jurisdiction over SprayFoam. 584 S.W.3d at 51–53. Because neither party argues in this Court that general jurisdiction exists, we consider only the issue of specific jurisdiction.

### B. Purposeful Availment

The "touchstone of jurisdictional due process [is] 'purposeful availment.'" *Spir Star*, 310 S.W.3d at 873 (alteration in original) (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168

S.W.3d 777, 784 (Tex. 2005)). There must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Where the defendant has "deliberately" engaged in significant activities within a state, he "manifestly has availed himself of the privilege of conducting business there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985) (cleaned up). And because such activities are shielded by the "benefits and protections" of the forum's laws, it is "presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 476.

When assessing minimum contacts, we look only to the defendant's contacts with the forum, *Michiana*, 168 S.W.3d at 785, and not the "unilateral activity" of some third party to determine whether minimum contacts with the state are satisfied, *Burger King*, 471 U.S. at 474 (quoting *Hanson*, 357 U.S. at 253). Nor will "fortuitous" or "attenuated" contacts be relied upon to satisfy the requirements of due process. *Moncrief Oil*, 414 S.W.3d at 151 (collecting cases). Rather, whether due process is satisfied depends upon "the quality and nature of the activity in relation to the fair and orderly administration of the laws." *Int'l Shoe*, 326 U.S. at 319.

When a corporation purposefully avails itself of the privilege of doing business in the forum state, it has "clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Undoubtedly, a nonresident defendant may "purposefully avoid" a particular jurisdiction "by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Michiana*, 168 S.W.3d at 785 (citing *Burger King*,

471 U.S. at 473). But "a truly interstate business may not shield itself from suit by a careful, but formalistic structuring of its business dealings." *Siskind*, 642 S.W.2d at 437.

The stream-of-commerce doctrine is a useful tool to conceptualize minimum contacts in product liability cases. Its utility derives from the recognition that specific jurisdiction over nonresident manufacturers is often premised on "indirect" sales by independent distributors or agents. *Spir Star*, 310 S.W.3d at 874. But a seller's awareness "that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product in the stream into an act purposefully directed toward the forum State." *CSR*, 925 S.W.2d at 595 (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112 (1987) (plurality opinion)). Following Justice O'Connor's plurality opinion in *Asahi*, Texas courts require "additional conduct" evincing "an intent or purpose to serve the market in the forum State," whether directly or indirectly. *TV Azteca*, 490 S.W.3d at 46 (quoting *Asahi*, 480 U.S. at 112); *Moki Mac*, 221 S.W.3d at 577; *CSR*, 925 S.W.2d at 595; *see also Daimler*, 571 U.S. at 128 n.7. Evidence of such additional conduct may include advertising in the forum state, *Asahi*, 480 U.S. at 112, soliciting business through salespersons, *World-Wide Volkswagen*, 444 U.S. at 295, or creating, controlling, or employing the distribution system that brought the product into the forum state, *CSR*, 925 S.W.2d at 595.

Thus, while "a nonresident need not have offices or employees in a forum state" to purposefully avail itself of the forum, *Michiana*, 168 S.W.3d at 785, the "operation of a sales and distribution network" or "direct[ing] marketing efforts to [the forum state] in the hope of soliciting sales" may render a nonresident subject to the state's jurisdiction in disputes "arising from that business," *id.* (citing *Int'l Shoe*, 326 U.S. at 313–14). Applying these standards, the activities

carried on in Texas on behalf of SprayFoam evince an intent to "serve the market," *Asahi*, 480 U.S. at 112, and are neither "irregular" nor "casual," *Int'l Shoe*, 326 U.S. at 320.

SprayFoam argues, however, that its numerous contacts with Connecticut make specific jurisdiction in Texas improper. But the contacts an entity forms with one jurisdiction do not negate its purposeful contacts with another. *See, e.g.*, *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 779–80 (1984). Thus, notwithstanding the contacts SprayFoam claims to have with Connecticut,[2] its conduct in Texas resulted not in a mere dribble, but in a stream of activity that allowed it to enjoy the benefits of doing business in this state. We address the key pieces of SprayFoam's contacts with Texas, which combine to afford Texas courts personal jurisdiction over SprayFoam.

### 1.     Distribution Center

Take first the distribution center. The Lucianos allege, and SprayFoam admits, that SprayFoam used a Texas distribution center located in Grand Prairie, Texas, "to handle logistics for its products in Texas." The Lucianos further allege that the technical data sheet for Thermoseal 500 demonstrates SprayFoam's need to have a local distribution center in Texas from which to ship its product. According to the product specifications, Thermoseal 500 is shipped in two components, A and B, which are mixed prior to use. Component B "must be stored between 50°F and 90°F[,] never exceeding either extreme." The Lucianos argue that the temperature limitation is evidence that SprayFoam purposefully procured a distribution center for "storage, delivery, and pickup services within the Texas marketplace" because its product "must be protected from the Texas heat."

---

[2] SprayFoam contends that Connecticut is where it was formed, retains its principal place of business, accepts customers' orders, approves and processes orders, employs personnel, and receives payment. While such information is relevant to determining general jurisdiction, the specific-jurisdiction inquiry is limited to contacts with the forum state. *See Keeton*, 465 U.S. at 779–80.

SprayFoam counters that use of the Texas distribution center is merely the byproduct of an agreement with a Colorado-based logistics company. This account, however, overlooks SprayFoam's purposeful acquisition of the warehouse space in Texas. SprayFoam engaged Acme Distribution Centers, Inc., a Colorado logistics company, to provide storage and distribution services in Texas.[3] SprayFoam admitted that it "contact[ed] [Acme's] warehouse up in the Dallas/Fort Worth area" and made arrangements for some of its products to be stored there. At SprayFoam's direction, Acme would ship from that store of supplies to the customer. SprayFoam's admission shows that the location of the warehouse was neither adventitious, *see Rush v. Savchuk*, 444 U.S 320, 329 (1980), nor thrust upon SprayFoam. SprayFoam's use of a warehouse to maintain a stock of merchandise in Texas was deliberate. *Int'l Shoe*, 326 U.S. at 313. Thus, while SprayFoam downplays the role of Acme's warehouse, Acme stored and delivered insulation at SprayFoam's direction and on SprayFoam's dime.

2. **Sales Representative**

Next, take SprayFoam's local sales representative, Preston Nix. SprayFoam admits it retained Nix as an "independent contractor sales representative" and "sold through him for a period of time . . . in the State of Texas." Put plainly, his job was to "find customers."

SprayFoam argues that it purposefully avoided the Texas marketplace by contracting with an independent contractor instead of retaining an employee. Nix's activities are not sufficient to manifest purposeful availment in Texas, SprayFoam argues, because it placed, processed, and accepted all sales in Connecticut, not Texas. Indeed, we have said that "[w]hile use of a Texas

---

[3] The record does not reveal whether the Texas warehouse was SprayFoam's sole distribution center, but it is not necessary to determine that because only SprayFoam's Texas contacts are relevant for the specific-jurisdiction analysis.

distributor may satisfy" purposeful availment, "there may be situations in which it does not," such as when the manufacturer does not "intend[] to serve the Texas market." *Spir Star*, 310 S.W.3d at 875. But where title passed is "beside the point" in the specific-jurisdiction analysis. *Id.* at 876 (quoting *Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 30 (1st Cir. 1988)). Whether due process is satisfied depends rather on the "quality and nature of the activity" in question. *Int'l Shoe*, 326 U.S. at 160.

SprayFoam also contends that it did not control the means or methods by which Nix conducted his business, nor did it provide him a company vehicle. But we need not decide whether Nix was an independent contractor or an employee because "it is not the actions of the Texas intermediary that count." *Spir Star*, 310 S.W.3d at 874. Our concern is with SprayFoam's own conduct directed towards marketing and distributing its products in Texas. *Id.* (stating that purposeful availment of local markets may be indirect "through affiliates or independent distributors" (citing *World-Wide Volkswagen*, 444 U.S. at 297)); *Moki Mac*, 221 S.W.3d at 576–77 ("[A] nonresident who places products into the 'stream of commerce' with the expectation that they will be sold in the forum state is subject to the forum's jurisdiction." (quoting *World-Wide Volkswagen*, 444 U.S. at 297–98)).

In *Spir Star,* we said that "[w]hen an out-of-state manufacturer . . . specifically targets Texas as a market for its products, that manufacturer is subject to a product liability suit in Texas based on a product sold here, even if the sales are conducted through a Texas distributor or affiliate." 310 S.W.3d at 874. There, the manufacturer utilized an independent distributor who "agreed to serve as the sales agent" in Texas, thus satisfying *Asahi*'s "additional conduct" standard. *Id.* at 875 (citing *Asahi*, 480 U.S. at 112). While the manufacturer in *Spir Star* did not receive any

11

of the intermediary's profits and relinquished title before the products reached Texas, the manufacturer "reap[ed] substantial economic gain through its sales." *Id.*

SprayFoam relied on Nix to act as a "sales agent" to market its products in Texas. SprayFoam utilized Nix as a sales solicitor and admitted in the trial court that it "sold through him for a period of time." SprayFoam compensated Nix for his efforts with commissions on his sales. Moreover, before the Lucianos filed their lawsuit, SprayFoam dispatched Nix to their home to investigate the alleged failure of its product by conducting testing and taking photographs on behalf of SprayFoam. *See, e.g.*, *Ford Motor Co.*, 141 S. Ct. at 1023 (considering relevant Ford's maintenance and repair services, which "foster[] an ongoing relationship between Ford and its customers"); *Kawasaki Steep Corp. v. Middleton*, 699 S.W.2d 199, 201 (Tex. 1985) (holding that specific jurisdiction was proper under a stream-of-commerce theory where the foreign manufacturer, among other things, provided "after-sales service" to its customers). With Nix's boots on the ground, SprayFoam tapped into the local market and reaped economic benefits from his sales. And SprayFoam "enjoy[ed] the benefits and protection of the laws" of Texas by hiring a salesman who resides here. *Int'l Shoe*, 326 U.S. at 319; *Spir Star*, 310 S.W.3d at 875. While SprayFoam provides no data on the volume of sales realized through Nix's efforts, the quality and nature of his role evince SprayFoam's "intent or purpose" to target the Texas market. *Asahi*, 480 U.S. at 112 (stating that "additional conduct" includes "advertising in the forum State . . . or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State"); *Moki Mac*, 221 S.W.3d at 577 ("[A] single contact can support jurisdiction if that contact creates a 'substantial connection' with the forum.").

In determining that SprayFoam's relationship with Nix did not show that SprayFoam purposefully availed itself of Texas, the court of appeals found Nix's status as an independent contractor dispositive of that inquiry. 584 S.W.3d at 52. But by dismissing Nix as irrelevant, the court denied the reality that SprayFoam took purposeful steps to exploit the local market by commissioning Nix to "find customers." *See Walden v. Fiore*, 571 U.S. 277, 285 (2014).

### 3. Selling to Texas-based Installers

The Lucianos allege, and SprayFoam does not dispute, that Old World, a Texas-based company, purchased Thermoseal 500 from SprayFoam and installed it in the Lucianos' home. The court of appeals, relying on the Lucianos' mental state, determined that this relationship was not indicative of purposeful availment. The court observed that nothing in the evidence showed that the Lucianos intentionally chose the installer based on any preexisting relationship they knew Old World had with SprayFoam. 584 S.W.3d at 52. The court's analysis, however, shifted the focus from the *defendant's* relationship with the forum state to the *plaintiff's intent*. But evidence of the plaintiff's mental state is immaterial to the defendant's purposeful availment. *See Ford Motor Co.*, 141 S. Ct. at 1029 (stating that jurisdiction "in cases like these [should not] ride on the exact reasons for an individual plaintiff's purchase, or on his ability to present persuasive evidence about them"); *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016) (explaining that "the defendant's relationship, not the plaintiff's relationship, with the forum state is the proper focus of the specific jurisdiction analysis").

Under our stream-of-commerce-plus precedent, specific jurisdiction exists if the defendant places goods into the stream of commerce "with the expectation that they will be purchased by consumers in the forum state." *Moki Mac*, 221 S.W.3d at 577 (citing *World-Wide Volkswagen*,

13

444 U.S. at 298). The exercise of jurisdiction is permitted, however, only when the defendant targets the forum, not when the defendant merely foresees his product ending up there. *Nicastro*, 564 U.S. at 884; *TV Azteca*, 490 S.W.3d at 46. In resolving questions of specific jurisdiction, we look both to "[t]he defendant's conduct and the economic realities of the market the defendant seeks to serve." *Nicastro*, 564 U.S. at 885.

Here, the Lucianos were unable to prove that Old World is a certified installer of SprayFoam's products. Nonetheless, they argue that the act of selling and shipping insulation to Old World is enough to show that SprayFoam "seek[s] to serve" the Texas market. *Nicastro*, 564 U.S. at 882 (citing *World-Wide Volkswagen*, 444 U.S. at 295). But "mere knowledge" that a product is "to be sold and used in Texas," does not—without more—show purposeful availment. *CMMC v. Salinas*, 929 S.W.2d 435, 439 (Tex. 1996). For instance, in *CMMC*, we held that a French manufacturer's knowledge that Texas was the intended destination of its winepress was insufficient to subject the manufacturer to personal jurisdiction here without evidence that the French manufacturer took additional steps to serve the Texas market. *Id.* at 438–39. Similarly, that SprayFoam sold insulation to Old World is not—without more—evidence of its purposeful availment of Texas.[4] Nevertheless, using Nix and a local distribution center to create a market to

---

[4] To support their contention that SprayFoam targets local installation companies like Old World, the Lucianos tendered evidence showing that SprayFoam maintained a website advertising that it operated a warehouse in Grand Prairie, Texas, at which prospective customers could place orders, make payments, and take delivery of product. SprayFoam argues that the website evidence is inadmissible because it consists of an unauthenticated screenshot from WaybackMachine, an archival source, and does not establish that the website was actually SprayFoam's. The Lucianos argue that the website screenshot was properly authenticated via an affidavit from their counsel as well as circumstantial evidence from a website-registration data provider, WHOIS database. The trial court overruled SprayFoam's objection to authentication. The court of appeals agreed, holding that the trial court did not abuse its discretion in admitting the screenshot but reserving the question of whether a screenshot from WaybackMachine can be admitted as an admission by party opponent over a hearsay objection. 584 S.W.3d at 50. Because the evidence of the distribution center and Nix's efforts in Texas are sufficient to establish that SprayFoam targeted the Texas market, we do not rely on the evidence of the website and, therefore, need not decide the propriety of admitting screenshots from archival sources such as WaybackMachine.

sell to Texas-based installation companies is relevant to the analysis and should not be disregarded under these facts.

***

Viewing SprayFoam's purposeful conduct with respect to Texas in totality, we cannot say that SprayFoam's contacts with Texas resulted from the "mere fortuity" that the Lucianos reside in Texas. *Moki Mac*, 221 S.W.3d at 578. Placing its product into the stream of commerce in conjunction with its "additional conduct" of soliciting business and distributing its product in Texas is sufficient to hold that SprayFoam purposefully availed itself of the Texas market. *See id.* at 577 (selling rafting trips to Texas residents combined with the "additional conduct" of purposefully directing marketing efforts into the state showed intent to solicit business in Texas); *TV Azteca*, 490 S.W.3d at 46–52.

### C. Relatedness

Despite a nonresident defendant's flood of purposeful contacts with the forum state, the exercise of specific jurisdiction is prohibited if "the *suit*" does not "aris[e] out of or relat[e] to the defendant's contacts with the *forum*." *Bristol-Myers*, 137 S. Ct. at 1780 (alteration in original) (quoting *Daimler*, 571 U.S. at 127). This so-called relatedness inquiry defines the appropriate "nexus between the nonresident defendant, the litigation, and the forum." *Moki Mac*, 221 S.W.3d at 579; *see also Walden*, 571 U.S. at 284; *Shaffer v. Heitner*, 433 U.S. 186, 213 (1977).

In *Moki Mac*, we held that the relatedness requirement is satisfied by a "substantial connection" between the nonresident defendant's contacts and the "operative facts of the litigation." 221 S.W.3d at 585. After *Moki Mac*, the Supreme Court in *Bristol-Myers* explained that the "arise out of or relate to" standard suggests there must be "an affiliation between the forum

15

and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." 137 S. Ct. at 1780 (alteration in original) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). In other words, "specific jurisdiction is confined to adjudication of issues *deriving from*, or *connected with*, the very controversy that establishes jurisdiction." *Id.* (emphasis added).

When we granted review in the instant case, the parties fervently debated whether a direct causal connection was required to satisfy the relatedness prong of the specific jurisdiction analysis. The Lucianos argued that the "relates to" portion of the test remains intact after *Bristol-Myers* and that SprayFoam's sales and distribution efforts in Texas *relate to* a lawsuit involving a sale of an allegedly defective product in Texas, to Texas residents, that resulted in harm in Texas. The Lucianos further contended that by conflating the purposeful availment and relatedness prongs of the analysis, the court of appeals utilized a more exacting standard for relatedness than due process requires. SprayFoam, however, argued that the court of appeals correctly applied this Court's precedent. SprayFoam asserts that without evidence that the Lucianos selected the installer because of a known, preexisting relationship with SprayFoam, that the Lucianos specifically chose Thermoseal 500, or that the Lucianos knew that the Thermoseal 500 installed in their home originated from its Texas warehouse, the court correctly held that the lawsuit does not "arise out of or relate to" its contacts.

Most recently in *Ford Motor Co.* the United States Supreme Court answered this causation question in the negative: "None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." 141 S. Ct. at 1026.

16

In light of that decision, we agree with the Lucianos that the court of appeals sought too exacting of a connection between SprayFoam's purposeful contacts in Texas and the suit.

**1.** ***Ford Motor Co. v. Montana Eighth Judicial District Court***

*Ford Motor Co.* involved two consolidated product liability cases stemming from car accidents in Montana and Minnesota that left one plaintiff dead and the other with brain damage. *Id.* at 1022–23. The facts of the cases are nearly identical. The accidents happened in the state where suit was brought. *Id.* at 1023. The victims were residents of the forum states. *Id.* The manufacturer—Ford—did substantial business in each state, including "advertising, selling, and servicing the model of vehicle[s]" the suits claimed were defective. *Id.* at 1022. Though Ford conceded purposeful availment, the Court catalogued Ford's business operations, noting that Ford "encourages a resale market for its products." *Id.* at 1022, 1028. It also engages in "wide-ranging promotional activities" to enhance its brand and increase its sales. *Id.* at 1022. And to improve the longevity of Ford vehicles, Ford and its network of dealers "offer[] an array of maintenance and repair services" to foster "an ongoing relationship between Ford and its customers." *Id.* at 1023.

Yet Ford contended that specific jurisdiction was lacking because the particular cars involved were originally sold outside the forum state and were neither designed nor manufactured there. *Id.* Relying on *Bristol-Myers*, Ford argued that a state court would have jurisdiction only if the company's conduct in the state "*gave rise to*" the plaintiff's claims, a causal link that exists only if the company designs, manufactures, or sells the particular vehicle involved in an accident in the forum state. *Id.* at 1023, 1026. The place of accident or injury becomes immaterial. *See id.* at 1023.

17

The Supreme Court rejected that argument, holding that "when a company like Ford serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit." *Id.* at 1022. A "causation-only approach finds no support in [the] Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities." *Id.* at 1026 (citing *Bristol-Myers*, 137 S. Ct. at 1776). Instead, due process demands that a suit "arise out of or *relate to*" the defendant's contacts with the forum. *Id.* (quoting *Bristol-Myers*, 137 S. Ct. at 1780). The first half of that standard, the Court said, "asks about causation." *Id.* The latter half "contemplates that some relationships will support jurisdiction without a causal showing." *Id.* "That does not mean anything goes," the Court warned, because "'relate to' incorporates real limits" to adequately protect nonresident defendants. *Id.*

The Court equated *Ford Motor Co.* to *World-Wide Volkswagen*—what it described as the "paradigm case" for specific jurisdiction. *Id.* at 1027–28. In *World-Wide Volkswagen*, the *Ford* Court observed, both Audi—the manufacturer—and Volkswagen—the nationwide importer— were subject to specific jurisdiction in Oklahoma because their business "deliberately extended into [that state]." *Id.* at 1027. The forum state could thus hold the companies accountable for injuries "even though the vehicle had been designed and made overseas and sold in New York." *Id.*

Ford contended that *Bristol-Myers* "squarely foreclose[d]" jurisdiction, but the Court rejected that argument, reasoning instead that *Bristol-Myers* reinforced its holding in *Ford Motor Co. Id.* at 1030–31. In *Bristol-Myers*, jurisdiction was improper because "a connection between the forum and the specific claims at issue" was lacking. 137 S. Ct. at 1781. The out-of-state plaintiffs, the Court said, had no ties to California and were simply forum-shopping. *Id.* at 1782–

83. By contrast, the *Ford* plaintiffs were residents of the forum states, used the allegedly defective products in the forum states, and suffered injuries in the forum states. 141 S. Ct. at 1031. Accordingly, *Bristol-Myers* did not foreclose jurisdiction. *Id.*

Addressing how Ford's Montana- and Minnesota-based conduct "relates to" the respective claims, the Court first noted that the suits were brought by residents of the forum states. *Id.* at 1028. Each suit arose from an accident in the forum state. *Id.* Each suit alleged that a defective Ford vehicle caused the resultant harm. *Id.* And "Ford had advertised, sold, and serviced those two car models in both States for many years." *Id.* Put succinctly, "Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States[, s]o there is a strong 'relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984)). While the plaintiffs did not establish, or even allege, that Ford's in-state activities resulted in their purchasing the cars, the Court said that jurisdiction should not "ride on the exact reasons for an individual plaintiff's purchase, or on his ability to present persuasive evidence about them" because the reach of Ford's Minnesota and Montana contacts underscored the aptness of finding jurisdiction. *Id.* at 1029. Allowing the forum states' courts to exercise jurisdiction in the two cases was neither undue nor unfair. *See id.* at 1029–30.

Because the United States Supreme Court has confirmed that due process does not mandate a causation-only approach, we reject SprayFoam's narrow conception of the relatedness requirement. *See Moki Mac*, 221 S.W.3d at 582–83 (rejecting a substantive-relevance or

proximate-cause approach). Instead, we apply the Supreme Court's precedent to determine whether the Lucianos' suit "arise[s] out of or relate[s] to" SprayFoam's Texas contacts.[5]

### 2. Application of *Ford Motor Co.*

As previously explained, SprayFoam purposely availed itself of doing business in Texas through the use of a sales representative in Texas and a Texas distribution center. As such, we turn to whether SprayFoam's Texas activities relate to the Lucianos' claims.

First, the Lucianos' suit arises from injuries sustained in their Texas home. *Ford Motor Co.*, 141 S. Ct. at 1028. The Lucianos complain, among other things, that SprayFoam sold a defective product, failed to warn of necessary risks, and misrepresented the purported safety of its product in its advertising and marketing. The court of appeals gave no credence to the location of the injury or the Lucianos' residence, even though an "activity [or] occurrence" involving SprayFoam's product took place in Texas. *Id.* at 1026 (alteration in original) (citing *Bristol-Myers*, 137 S. Ct. at 1780). While "plaintiff's residence in the forum State is not a separate requirement" for specific jurisdiction and "lack of residence will not defeat jurisdiction established on the basis of defendant's contacts," *Keeton*, 465 U.S. at 780, that the lawsuit arises from an injury which occurred in the forum state is a relevant part of the relatedness prong of the analysis, *Ford Motor Co.*, 141 S. Ct. at 1028 ("Each plaintiff's suit, of course, arises from a car accident in one of those States."); *cf. Bristol-Myers*, 137 S. Ct. at 1782 (holding that the connection between the

---

[5] The Lucianos argue that *Ford Motor Co.* confirms our "substantial connection" standard presented in *Moki Mac*, *TV Azteca*, and *Spir Star*. But we need not address that argument today. Our holding today rests on the Supreme Court's analysis in *Ford Motor Co.*—a case whose factual circumstances resembles those before us—to determine whether a product liability lawsuit "arise[s] out of or relate[s] to" a nonresident defendant's contacts with the forum state. As such, we need not determine whether our "substantial connection" standard exceeds the bounds of due process because here the due-process standard is necessarily met.

nonresidents' claims and the forum was weak because the "relevant plaintiffs are not California residents and do not claim to have suffered harm in that State").

Second, the Lucianos allege—and SprayFoam does not deny—that SprayFoam sold Thermoseal 500 in Texas.[6] Moreover, SprayFoam does not contend that the sale of Thermoseal 500 to Old World was an "isolated occurrence" in Texas. *See, e.g.*, *World-Wide Volkswagen*, 444 U.S. at 297. Rather, as discussed above, SprayFoam "served a market" in Texas "for the very [spray foam insulation] that the plaintiffs allege malfunctioned and injured them" in Texas. *Ford Motor Co.*, 141 S. Ct. at 1028. Therefore, "there is a strong 'relationship among the defendant, the forum, and the litigation'—the 'essential foundation' of specific jurisdiction." *Id.* (quoting *Helicopteros*, 466 U.S. at 414).

In determining that the Lucianos' lawsuit did not relate to SprayFoam's Texas contacts, the court of appeals relied on *Bristol-Myers* and reasoned that the Lucianos "did not allege where the Thermoseal 500 was shipped from." 584 S.W.3d at 53. Without evidence that the exact barrel of spray foam installed in their home originated from SprayFoam's Grand Prairie distribution center, the court reasoned that the lawsuit did not relate to SprayFoam's Texas activity. But such a strict causal connection is not required. It is sufficient that SprayFoam intended to serve a Texas market for the insulation that the Lucianos allege injured them in this lawsuit. *See Ford Motor Co.*, 141 S. Ct. at 1028. Nor does *Bristol-Myers* foreclose a finding of specific jurisdiction here because that case involved out-of-state plaintiffs whose claims lacked a connection with the forum state. *See* 137 S. Ct. at 1781–82; *see also Ford Motor Co.*, 141 S. Ct. at 1030–31.

---

[6] Once a plaintiff in Texas pleads sufficient allegations to bring the nonresident defendant within the provisions of the long-arm statute, the defendant then bears the burden to negate all jurisdictional bases. *See BMC Software*, 83 S.W.3d at 793. And unless the defendant challenges a finding for factual sufficiency, we presume all factual disputes were resolved in favor of the trial court's decision. *Id.*

In light of the alleged injury in Texas giving rise to the lawsuit and evidence of additional conduct evincing an intent to serve the Texas market, we hold that the evidence supports the trial court's conclusion that SprayFoam has sufficient minimum contacts to support specific jurisdiction in Texas.

### D. The Court of Appeals' Treatment of the Minimum Contacts Analysis

The court of appeals conflated the purposeful-availment inquiry and the relatedness inquiry even though specific jurisdiction has "two co-equal components." *Moki Mac*, 221 S.W.3d at 579. For example, the court of appeals dismissed Nix as an irrelevant contact, stating that "Nix visited the Lucianos' home after the installation of the Thermoseal 500 . . . . [A]nd their claims are related to the installation of the SprayFoam product and are not derived from or connected to SprayFoam's relationship with Nix." 584 S.W.3d at 51–52. The court discussed the Texas-based installation company in the same way, noting, "[T]he Lucianos did not present evidence that they selected the installer because of its relationship with or training and certification by SprayFoam." *Id.* at 52. It was not until "a year after the installation," the court reasoned, that the Lucianos even knew that Thermoseal 500 had been installed in their home or that SprayFoam was the manufacturer. *Id.* By compressing the analysis into one step, the court entangled the evidence relevant to SprayFoam's purposeful Texas contacts with evidence necessary to establish the lawsuit's relatedness to those contacts.

In *TV Azteca*, we distinguished between "actionable conduct" and "additional conduct." 490 S.W.3d at 53. Actionable conduct is that "from which the claim arose" and forms the basis of liability, such as a hiking accident. *Id.* Additional conduct demonstrates "an intent or purpose to serve the market in the forum State," such as advertising there. *Id.* at 47 (quoting *Moki Mac*, 221

22

S.W.3d at 577). The actionable conduct in *TV Azteca*—allegedly defamatory broadcasts—occurred in Texas, so we did not need to determine whether the plaintiff's claims arose from the nonresident defendant's additional conduct in Texas. *Id.* at 54–55. In other words, if the actionable conduct occurs in Texas, we have never required that the lawsuit also arise directly from the nonresident defendant's additional conduct. *Id.* The additional conduct serves merely to ensure that the nonresident defendant has purposefully targeted the Texas market. *Id*. Here, SprayFoam's actionable conduct involved allegedly causing injury in Texas to Texas residents. Additional conduct that it tapped into the Texas market is evinced by its use of a Texas distribution center and a Texas sales representative to create a market to sell to local installers. By requiring a direct causal connection between SprayFoam's additional conduct and the lawsuit, the court of appeals utilized too exacting a standard, one that the Supreme Court in *Ford Motor Co.* reiterated is not required to pass constitutional muster. 141 S. Ct. at 1026 ("Ford's causation-only approach finds no support in this Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities.").

Finally, by viewing the jurisdictional facts through the narrow lens of a single cause of action—the *installation* claim—the court of appeals limited the scope of the Lucianos' pleadings, which allege causes of action for not only the installation of the product, but also the sale and representations made regarding the product. When all the claims arise from the same forum contacts, a claim-by-claim analysis is not required. *Moncrief Oil*, 414 S.W.3d at 150–51.

### E. Fair Play and Substantial Justice

Once minimum contacts have been established, we must still consider whether, for other reasons, exercising jurisdiction over the nonresident defendant would nevertheless run afoul of

"traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316; *TV Azteca*, 490 S.W.3d at 55. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Spir Star*, 310 S.W.3d at 878 (quoting *Guardian Royal Exch. Assurance, Ltd. v. Eng. China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991)). We consider the nonresident defendant's contacts in light of (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of several states in furthering fundamental substantive social policies. *Id.* (cleaned up).

The burden on SprayFoam to defend the claims in Texas is not undue. "[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state." *Int'l Shoe*, 326 U.S. at 319. Exercise of that privilege may give rise to obligations, such as responding to suit, which cannot be said to be undue. *Id.* The fact that SprayFoam has its place of business in Connecticut cannot, by itself, defeat jurisdiction. *Spir Star*, 310 S.W.3d at 879; *see also McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) ("[M]odern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.").

Texas has a strong interest in exercising jurisdiction over controversies arising from injuries sustained from hazardous chemicals that are purposefully brought into the state and are installed in residential homes and commercial buildings. *See Spir Star*, 310 S.W.3d at 879. Moreover, by virtue of the Legislature's enactment of the Deceptive Trade Practices Act, the

statutory source of one of the Lucianos' claims, Texas has demonstrated a special interest in protecting its citizens from the sort of activity alleged here. *Siskind*, 642 S.W.2d at 437.

Texas is also the most logical forum for the litigation because Texas is where the witnesses related to the sale, installation, and remedial services reside. Doctors who treated the Lucianos after the alleged injuries are also in Texas. And of course, the Luciano home, which lies at the heart of the litigation, is in Texas. Thus, while title to the spray foam may have transferred in Connecticut, our judicial system's interest in obtaining "the most efficient resolution of controversies" supports the exercise of jurisdiction in Texas. *TV Azteca*, 490 S.W.3d at 56.

### III. Conclusion

The evidence supports the trial court's conclusion that SprayFoam has sufficient minimum contacts with Texas such that the exercise of specific jurisdiction over SprayFoam will not offend traditional notions of fair play and substantial justice. Accordingly, the trial court correctly denied SprayFoam's special appearance. We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

John P. Devine
Justice

**OPINION DELIVERED:** June 25, 2021